UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL BUSHFIELD,<br><br>                    Plaintiff,<br><br>v.<br><br>PATRICK R. DONAHOE, Postmaster<br>General of the United States Postal<br>Service,<br><br>                    Defendant. | Case No. 1:11-cv-00251-CWD<br><br>**MEMORANDUM DECISION AND<br>ORDER** |

## INTRODUCTION

Before the Court is Defendant Patrick Donahoe's Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56(c). (Dkt. 23.) Donahoe, the Postmaster General of the United States Postal Service, requests summary judgment on the two claims former postal service employee Michael Bushfield asserts in his Complaint, filed on May 26, 2011. Bushfield alleges both interference and retaliation under 29 U.S.C. §§ 2615(a)(1) and (a)(2) of the Family Medical Leave Act ("FMLA"). For the reasons set forth below, Donahoe's motion for summary judgment will be denied. Genuine issues of material fact exist and preclude the Court from finding as a matter of law that the Postal Service did not violate the FMLA.

## FACTS[1]

Bushfield applied for work with the Postal Service on or about October 31, 2007, and later was offered a position as a full-time mail handler at the Postal Service's Boise Processing and Distribution Center. Before starting work, Bushfield completed an Appointment Affidavit on November 29, 2007. The Affidavit contained an acknowledgment that Bushfield's employment "<u>may</u> be terminated at any time should it be determined that [he had] falsified any information contained in [his] application for employment or in th[e] affidavit." (Dkt. 25-3 at 23.) (emphasis added).

One of the questions in the Affidavit asked Bushfield if he had been fired from employment for any reason, to which Bushfield answered "no." *Id.*  Bushfield certified that all of his answers in the Affidavit were true as of November 29, 2007. Bushfield had, however, been let go from his previous job at Aladdin Bail Bonds. (Dkt. 31 at 44; Dkt. 28 at 10—11.) Bushfield had intended to continue working at Aladdin until he was scheduled to begin work at the Postal Service on December 26, 2007, but upon submitting his letter of resignation, he was told by Aladdin to go home and not to return. (Bushfield Depo. at 78, Dkt. 28 at 11.)

On December 6, 2007, Bushfield completed a medical questionnaire for the Postal Service.. The questionnaire was given to all career appointees and was used by the Postal Service to determine a prospective employee's medical suitability and ability to perform the specific duties of the position for which he had applied. The medical questionnaire asked numerous questions, including the following with Bushfield's answers in bold:

---

[1] The Court finds the following facts undisputed for purposes of Donahoe's motion.

**MEMORANDUM DECISION AND ORDER - 2**

1. Do you consider yourself to be in good health? **Yes.**
33. Have you been treated for a mental or psychiatric problem in the past five years? **No.**
34. Are you receiving counseling or taking any medicine for a mental or psychiatric problem? **No.**
54. How do you rate your health?
**A. Excellent**
B. Good
C. Fair
D. Poor
60. Do you have a family doctor or healthcare provider/clinic? **No.**
64. Within the past year has a doctor advised you to take medicine regularly? **No.**
68. Are you currently being treated for an illness or injury? **No.**
71. Have you been advised that you currently have a serious health condition? **No.**

Bushfield acknowledged that his failure to "answer truthfully on this form may result in my ineligibility for employment . . . or may result in my termination of employment," and he certified that all answers were true and correct "to the best of [his] knowledge and belief." (Dkt. 24-1 at 2.)

In addition to the medical questionnaire, Bushfield reviewed and signed a form on December 6, 2007, describing the functional and environmental characteristics of the position, and certified that he did not have any "medical disorder or physical impairment which could interfere in any way with the full performance of duties of the position for which [he] was applying." (Dkt. 28-1 at 25.) The functional characteristics listed included such requirements as being able to lift up to 70 pounds, pulling, reaching, walking, standing, being outside and being subjected to noise and dust.

With the questionnaire, Bushfield signed a Medical Authorization and Release form consenting and authorizing any health care provider to disclose to

the Postal Service any information or records concerning his "health or medical history as may be relevant and necessary for a determination of my physical and medical suitability for employment" with the Postal Service. (Dkt. 24-1 at 12.) On December 26, 2007, prior to beginning work, Bushfield reviewed and recertified that the information contained in the Appointment Affidavit was correct.

Bushfield began work on December 26, 2007. He completed his ninety day probationary period without any unscheduled absences. However, beginning March 29, 2008, Bushfield began to have unscheduled absences. As a result, on October 22, 2008, he was issued a Letter of Warning for unscheduled absences without an acceptable explanation that had occurred on March 29, April 20, August 18, September 10, October 4, and October 5, 2008. (Dkt. 25-3 at 17.)

Following the letter of warning, Bushfield received a seven day suspension for "irregular attendance" on January 23, 2009. (Dkt. 28-1 at 30.) The suspension letter indicated that a review of Bushfield's attendance record since December 6, 2008, revealed absences on December 6, 14, and 21, 2008, and January 3 and 17, 2009.  However, after a meeting with Bushfield's union representative, the suspension was settled through the grievance process and Bushfield continued to work during the suspension. (Bushfield Depo., Dkt. 28 at 17.) During an investigative interview that occurred on January 23, 2009, Bushfield indicated he had completed FMLA paperwork at the suggestion of one of his supervisors, Ryan Mothershead, when he was counseled about his attendance problems. (Dkt. 30-1 at

**MEMORANDUM DECISION AND ORDER - 4**

3, 40.) He explained that his prior attendance problems were caused by a health condition that he was "processing FLMA paperwork for."

On or about February 10, 2009, Bushfield submitted a request for FMLA leave. The request included a FMLA certification dated February 5, 2009, from Bushfield's physician, Dr. Karen McPeak, indicating that Bushfield suffered from a service connected disability for PTSD, a chronic condition requiring periodic visits for medical follow up. (Dkt. 28-1 at 26.) Dr. McPeak indicated that the approximate date the condition commenced was June of 2005, when Bushfield received an honorable discharge from military service. Dr. McPeak also indicated that Bushfield required period visits with his therapist, and that he would be unable to work when having an acute episode. Bushfield's request for intermittent FMLA leave was approved on February 20, 2009. (Dkt. 31-1 at 2.) He was approved for unscheduled leave "2—3 times every 3 months for one day each time." He was not asked to present a fitness-for-duty certificate to be restored to employment.

After approval of Bushfield's FMLA leave request, the FMLA coordinator, Shelly Galindo, suggested to Bushfield's supervisors that they investigate further regarding Bushfield's answers to his pre-employment questionnaire and his doctor's certification that his PTSD symptoms began prior to his employment. On February 23, 2009, Bushfield's supervisor, Marc Boyer,[2] and the Manager of Labor Relations in Spokane, Jim Sykes, requested and obtained copies of

---

[2] Boyer did not have a medical background or medical training.

Bushfield's pre-employment medical questionnaire. (Dkt. 28-5 at 3-4.) Upon reviewing the answers, they undertook further investigation.

On March 12, 2009, Boyer interviewed Bushfield with his union representative, Ernie Barnett, present. Boyer removed Bushfield from the work floor to do so. (Dkt. 30-1 at 3.) The questions Boyer asked Bushfield included questions about his treatment for PTSD, how often he visited with his doctors, and about his pre-employment paperwork, wherein Bushfield denied having a medical condition for which he was being treated. (Dkt. 28-5 at 5—7.)[3] Bushfield acknowledged during the interview that he had been seen for the condition, but clarified that he was not receiving "frequent treatment. I didn't know it was such a big thing. It wasn't until I filed for disability [in July of 2008][4] that I understood it was a serious condition." (Dkt. 28-5 at 6.)

On March 19, 2009, Boyer again questioned Bushfield, with Barnett present. (Dkt. 28-5 at 7.) Boyer drafted and asked Bushfield a series of sixty-nine questions about his PTSD and FMLA leave, and advised Bushfield his answers could be used against him. (Dkt. 28-4 at 10.) The questions covered the severity of his PTSD episodes, the side effects, any incapacitation he suffered, medication necessary to recover, the longest time he had ever been incapacitated due to

---

[3] The questions included the following:
- Was PTSD a medical condition that you had to learn to cope with in your daily life?
- Is it correct that you may be required to have visits with your Therapist 2-4 times per month?
[4] Bushfield had been employed for eight months before he filed for disability with the Veterans Administration.

**MEMORANDUM DECISION AND ORDER - 6**

PTSD, his history of "mental breakdowns," and whether it was possible to make a "complete recovery." (Dkt. 25-5 at 7—15.)[5]

On March 25, 2009, Dr. McPeak submitted a letter to the Postal Service at Bushfield's request to clear up the confusion regarding Bushfield's PTSD diagnosis. Dr. McPeak wrote that Bushfield's medical records showed he was seen only once for nightmares in 2005, a symptom suggestive of PTSD, and that he sought irregular treatment thereafter. She explained that Bushfield had not received a formal diagnosis of PTSD until October of 2008. (Dkt. 30-1 at 43.)

On April 21, 2009, Boyer gave Bushfield a Notice of Proposed Removal during Bushfield's shift, escorted Bushfield to the door, and placed Bushfield on paid administrative leave. The Notice, dated April 20, 2009, informed Bushfield that the Postal Service proposed to remove him from his employment for "falsification of pre-employment medical questionnaire." (Dkt. 28-5 at 16—19.) The Postal Service considered Bushfield's answers to questions 33, 34, and 68 in the questionnaire, wherein Bushfield answered "no" to questions about treatment received for a mental or psychiatric problem, and whether he was then being treated for an illness, to be false.

---

[5] The questions included the following:
- How did your doctor come to the conclusion that this condition [PTSD] would result in being absent from work for that frequency or duration?
- When you are having an episode, do they vary in severity?
- When you are having an average episode, please explain how it affects you both physically and mentally?
- Please explain the side effects that you have to endure?
- Did you have any mental breakdowns while in the service or after returning from active duty?

**MEMORANDUM DECISION AND ORDER - 7**

On April 30, 2009, Plant Manager Draney questioned Bushfield again about his PTSD diagnosis and requested Bushfield's VA medical records. Bushfield provided a copy of Dr. McPeak's March 25, 2009, letter and his VA Disability rating decision, which he had not previously provided to the Postal Service.

Bushfield's VA disability decision, dated October 31, 2008, indicated that Bushfield filed a disability claim on July 8, 2008, as a result of his army service from March 26, 2002, to May 31, 2005. (Dkt. 30-1 at 27.) The VA decision found Bushfield suffered from PTSD since his discharge from the army, but the diagnosis was not effective until July 8, 2008, because his VA treatment records indicated that his providers assessed his nightmares and anxiety as "an impression of PTSD" only as of June 2005. The evaluators were unable to assign an earlier effective date of onset because VA providers reported an impression or provisional PTSD diagnosis, "which is not considered a formal diagnosis of the condition."

On May 5, 2009, Plant Manager Draney again requested Bushfield sign a medical release authorizing his employer's full access to Bushfield's VA medical records, because the "information is needed in order to do a thorough investigation and to confirm whether you did or did not falsify your pre-employment medical history questionnaire." (Dkt. 30-1 at 45.) The letter indicated that, in response to the interview questions, "it appears you falsified your medical history questionnaire," and that Bushfield's refusal to provide his medical records would

**MEMORANDUM DECISION AND ORDER - 8**

demonstrate he did falsify his application "otherwise you would gladly release them."

On May 12, 2009, Bushfield responded to Draney's letter, indicating he felt he provided Draney with independent documentation about his condition, and refusing to provide access to his medical files. (Dkt. 30-1 at 48.) Bushfield maintained that he was unaware that he had a mental or psychiatric problem, and that he did not consider himself to be receiving counseling for PTSD or medication for a chronic psychiatric condition, at the time he applied for employment with the Postal Service. (Dkt. 30-1 at 51.) He believed that the nightmares and sleeplessness he had been suffering after returning from Iraq in 2005 were normal reactions to the events he had witnessed during combat. (Dkt. 30-1 at 2.)

On June 5, 2009, after paid administrative leave for almost 45 days, Plant Manager Dennis Draney notified Bushfield that the decision to terminate Bushfield's employment based upon the charge of falsifying his pre-employment medical questionnaire was rescinded, and Bushfield was to report to work as scheduled on June 6, 2009. (Dkt. 25-3 at 39.) Bushfield returned to work on June 6, 2009, and worked a full shift. (Dkt. 25-3 at 27.) Thereafter, Bushfield worked two hours of his shift on June 7, 2009, and requested FMLA leave for the remaining 6 hours and again for June 8, 2009.

Bushfield's reason for leaving work on June 7, 2009, and for not returning on June 8, 2009, stemmed from alleged comments by supervisor Dan Day. (Bushfield Decl. ¶21, Dkt. 30-1 at 5.) Bushfield claims Day commented about Bushfield's PTSD, and acted

**MEMORANDUM DECISION AND ORDER - 9**

aggressively toward him. In addition, Bushfield heard that Day had been spreading rumors that Bushfield had suffered a mental breakdown. After the confrontation, Bushfield suffered a panic attack and was admitted to the emergency room the morning of June 8, 2009, for treatment. (Dkt. 30-1 at 54.) Bushfield worked a full shift on June 11, 2009, worked approximately two hours on June 12, 2009, and another 2 hours on June 13, 2009, before requesting sick leave. Bushfield called in sick on June 14 and 15, 2009, as well. On June 18, 2009, Bushfield called to inform Boyer, his supervisor, that he was resigning and would not be returning to work because of mistreatment by management. (Dkt. 25-3 at 26, 27.)

Labor Relations Specialist Jimmy Ball had reviewed the information available to the Post Office on June 5, 2009, and informed the Western Area Office that he would not support the proposed removal or any discipline based upon charges stemming from falsification of Bushfield's pre-employment medical questionnaire. (Dkt. 24 at 3—4.) However, upon reviewing Bushfield's medical records obtained during the course of discovery in this lawsuit, Ball learned that Bushfield had been treated for PTSD prior to beginning his employment with the Postal Service. (Dkt. 24 at 5.) He explained that it was Postal Service policy to "discharge employees who were found to have falsified material information in connection with their pre-employment applications." (Dkt. 24 at 6.) Ball avers that, had he known of the information contained in Bushfield's medical records prior to June 5, 2009, he would have advised the Boise office to terminate Bushfield's employment for falsifying his application and medical history questionnaire.

**MEMORANDUM DECISION AND ORDER - 10**

(Dkt. 24 at 8.) Boyer indicated that the fact Bushfield had PTSD would not have automatically disqualified Bushfield from employment. (Dkt. 28-4 at 15.)

## ANALYSIS

### 1.    Summary Judgment Standards

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims ...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

**MEMORANDUM DECISION AND ORDER - 11**

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Id*. at 526–57. The non-moving party must go beyond the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

Further, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co*., 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002); *see also* Fed.R.Civ.P. 56(e). In determining admissibility for summary judgment purposes, it is

**MEMORANDUM DECISION AND ORDER - 12**

the contents of the evidence rather than its form that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Id.* (affirming consideration of hearsay contents of the plaintiff's diary on summary judgment because at trial, the plaintiff's testimony of contents would not be hearsay).

Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). The Ninth Circuit Court of Appeals "has repeatedly held that documents which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988).

## 2. The FMLA's Purpose and Framework

Congress enacted the FMLA in response to growing concerns about inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods of time. *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1082 (9th Cir. 2002). It is an expressed purpose of the statute to "entitle employees to take reasonable leave for medical reasons . . . in a manner that accommodates the legitimate interests of employers." 29 U.S.C. § 2601(b)(2)-(3);  *see also Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1120 (9th Cir. 2001)(describing the purpose of the FMLA to "balance the demands of the workplace with the needs of employees to take leave for eligible medical conditions"). The FMLA does not replace traditional employer-established sick and personal leave policies; rather, it provides leave for uncommon and

often stressful events such as caring for a family member with a serious health condition. *See, e.g., Scamihorn*, 282 F.3d at 1082.

To effect this purpose, the FMLA guarantees an "eligible employee" twelve work weeks of leave each year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA further provides that the taking of such leave "shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." *Id*. § 2614(a)(2). An employee may sue to recover damages or equitable relief when her employer "interfere[s] with, restrain[s], or den[ies] the exercise or attempt to exercise" the rights guaranteed by the statute. *Id*. §§ 2615(a)(1), 2617(a)(2).

The FMLA places affirmative obligations on employers to notify employees of their rights and obligations under the Act, 29 U.S.C. § 2619; provide up to twelve weeks of unpaid leave to employees who qualify and provide sufficient notice to their employers, 29 U.S.C. § 2612; refrain from disciplining employees for taking leave covered by FMLA, 29 U.S.C. § 2615; reinstate employees to the same or equivalent job after their leave, 29 U.S.C. § 2614(a); and continue employees' health care benefits during their absence. 29 U.S.C. § 2614(c).

Additionally, the right to FMLA leave includes the right to absences on an intermittent basis. 29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.203.[6] Employees may take

---

[6] Title 29, Part 825 of the Code of Federal Regulations implementing the FMLA was revised on November 17, 2008, with the revisions taking effect on January 16, 2009. The revisions became effective before Bushfield's resignation on or about June 18, 2009. Thus, the regulations applicable are those that were in effect at the time Bushfield resigned in June of 2009. Further, in

MEMORANDUM DECISION AND ORDER - 14

leave in any size increments and employers may account for the leave in the shortest period of time the payroll system uses to calculate absences. 29 C.F.R. § 825.203(d).

Bushfield's Complaint alleges two distinct violations of the FMLA. Count one alleges interference, while count two alleges retaliation. Under § 2615(a)(2), the FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." An allegation of a violation of this section is known as a discrimination or retaliation claim. *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011). A retaliation claim requires application of the *McDonnell Douglas v. Green* burden shifting framework. *Id.*; *see also Shepard v. City of Portland*, 829 F.Supp.2d 940, 953—54 (D. Or. 2011) (explaining that in the Ninth Circuit, *McDonnell Douglas* applies to a retaliation claim under 2615(a)(2)). Thus, under § 2615(a)(2), a plaintiff must establish a prima facie case of discrimination or retaliation. If he does so, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." *Sanders*, 657 F.3d 777 n.3. If the employer articulates a legitimate reason for its action, the plaintiff must then establish the reason is pretextual, either by showing the employer's proffered explanation is not credible, or by showing that unlawful discrimination more likely than not motivated the employer. *Id.*

---

considering the motion, the Court will rely on the Code of Federal Regulations in effect at the time of Bushfield's resignation, considering substantive agency regulations have the force of law if authorized by Congress and promulgated to implement a statute. *See, e.g., United States v. Walter Dunlap & Sons, Inc.*, 800 F.2d 1232, 1238 (3rd Cir. 1986).

**MEMORANDUM DECISION AND ORDER - 15**

Alternatively, under § 2615(a)(1), it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided under the FMLA. When a plaintiff alleges a violation of 2615(a)(1), it is known as an interference or entitlement claim. *Sanders*, 657 F.3d at 777—78. In the Ninth Circuit, the *McDonnell Douglas* framework does not apply to an interference claim. *Id.* at 778. Instead, an employee need only establish that: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Sanders*, 657 F.3d at 778. The employer's intent is irrelevant to a determination of liability in an interference claim. *Sanders*, 657 F.3d at 778. Further, the burden of proof rests upon the employer, not the employee, to show that it had a legitimate reason to deny an employee reinstatement, or in this case, continued employment. *Sanders*, 657 F.3d at 780.

**3.     Retaliation Claim**

As an initial matter, Donahoe contended that count two, Bushfield's retaliation claim, must be dismissed under Fed. R. Civ. P. 12(b)(6) because the United States Court of Appeals for the Ninth Circuit in *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133, n.7 (9th Cir. 2003), "flatly rejected § 2615(a)(2) retaliation claims." (Mem. at 9, 13 n.5, Dkt. 23-1.) Donahoe is wrong. As explained above, the Ninth Circuit in *Sanders*, decided after *Xin Liu*, held that there are two theories for recovery under 29 U.S.C. § 2615, the "retaliation or discrimination theory and the entitlement or interference theory." 657 F.3d at 777.

**MEMORANDUM DECISION AND ORDER - 16**

At the hearing on his motion, however, Donahoe acknowledged that *Sanders* recognizes two distinct claims, and clarified that he contends the retaliation claim is simply a restatement of Bushfield's interference claim and should be considered as such. (Mem. at 13 n.5, Dkt. 23-1). [7] Donahoe asserted that the claims "merged," and should be treated as one claim, as the court did in *Xin Liu*. However, *Xin Liu* does not stand for the proposition that any time an employee asserts a claim that an employer took adverse employment action against an employee for asserting a right to take FMLA leave it should be treated as an interference claim. Rather, in *Xin Liu*, the Court treated the plaintiff's claim as an interference claim because she "misidentifie[d] her interference claim as a 'retaliation' and 'discrimination claim.'" *Xin Liu*, 347 F.3d at 1134 n.8. In other words, the court corrected the plaintiff's error in pleading the wrong claim. But *Xin Liu* blended the tests articulated above, discussing pretext in the context of Xin Liu's retaliation claim. However, *Xin Liu* was decided before *Sanders*. The court did not have the benefit of future decisions in which the two distinct causes of action were identified and the elements clarified.  In fact, the *Xin Liu* decision "reserved judgment on whether the *McDonnell Douglas* analysis" applied in a retaliation action under Section 2615(a)(2).

After *Xin Liu*, the Ninth Circuit issued the *Sanders* decision, which recognizes two distinct claims and two distinct tests. Bushfield pled two different claims under the FMLA. His claim for retaliation alleges that, upon requesting FMLA leave, he was

---

[7] Donahoe notes correctly in its Reply Memorandum that Bushfield did not respond to his argument that Bushfield's claim for retaliation should be dismissed. (Reply Mem. at 3—4, Dkt. 33.) However, Donahoe asserted an incorrect legal argument in support of its motion, and failed to distinguish *Sanders*, in its briefing. Therefore, based upon the argument presented in the briefing, no response was required. Further, Bushfield clarified at the hearing that he intended to proceed with both counts.

**MEMORANDUM DECISION AND ORDER - 17**

retaliated against.  More specifically, Bushfield claims the unlawful medical inquiries and the two medical inquisitions by Boyer constituted retaliatory conduct resulting in constructive discharge. Bushfield has adequately pled a claim for retaliation under Section 2615(a)(2), and his claim is not subject to dismissal under Rule 12(b)(6) as Donahoe argues.

Further, there are disputed issues of material fact, as more fully explained below. The Court will therefore focus the remainder of its memorandum on count one, Bushfield's interference claim, as it comprises the majority of Donahoe's argument.

**4.     Interference Claim**

Donahoe concedes that Bushfield was eligible for FMLA's protections, that the Postal Service's Boise office is a covered employer under the FMLA, and that Bushfield was entitled to intermittent leave under the FMLA. As for Bushfield's notice of his entitlement to leave, Donahoe simply contends without argument that it was "debatable" whether Bushfield provided sufficient notice of his intent to take FMLA leave, noting only that Bushfield did not request FMLA leave for his health condition until February of 2009. There is no dispute, however, that on February 10, 2009, Bushfield submitted a request for FMLA leave, which leave was approved on February 20, 2009. (Def.'s Mem. at 14, Dkt. 23-1.)  Therefore, the only disputed issue is the last element, whether the Postal Service denied or interfered with Bushfield's rights under the FMLA.

Interference under § 2615(a)(1) has been interpreted broadly to not only include denial of FMLA rights, but also to encompass instances where an employer has discouraged an employee from using FMLA leave, retaliated against an employee for

having exercised or attempted to exercise FMLA rights, or otherwise caused the

employee to suffer an adverse employment action as a consequence of taking FMLA

leave. 29 C.F.R. §825.220(b), (c); *Bachelder v. Am West Airlines, Inc.*, 259 F.3d 1112,

1125 (9th Cir. 2001) (to succeed on FMLA interference claim, a plaintiff must show by a

preponderance of the evidence that the taking of FMLA protected leave constituted a

negative factor in the decision to terminate the plaintiff's employment or to visit other

adverse employment actions upon the plaintiff). The Ninth Circuit takes an expansive

view of what constitutes an adverse employment action, and has interpreted such actions

to include lateral transfers, unfavorable job references, changes in work schedules, or any

other action that would be reasonably likely to deter employees from engaging in

protected activity. *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000).

A plaintiff must establish he was harmed by the violation of § 2615(a)(1) and

entitled to one or more of the remedies set forth in 29 U.S.C. § 2617. Such remedies

include damages equal to the amount of wages lost, or other actual monetary losses

sustained by the violation, as well as equitable relief. However, the employee is not

entitled to any rights, benefits, or positions they would not have been entitled to had they

not taken leave. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003).

### A.   *Adverse Employment Action*

Donahoe argues Bushfield was not subject to an adverse employment action

between February of 2009 and June of 2009, and asserts two arguments. First, he

contends that the Postal Service's legitimate investigation into Bushfield's "honesty,

suspected FMLA abuse and the authenticity of medical certifications" does not equate to

**MEMORANDUM DECISION AND ORDER - 19**

interference; and second that the medical inquiry, which consisted of distinct "incidents" or "slights," does not constitute an adverse employment action. Bushfield contends, however, that the investigation was pretextual, and the investigation itself amounted to harassment designed to interfere with Bushfield's FMLA rights.

First, Donahoe has not explained how the "incidents," when considered as a whole, do not rise to the level of an adverse employment action under the expansive Ninth Circuit definition. The Postal Service investigation was intrusive, pervasive, and went beyond a mere investigation into Bushfield's honesty. Further, Bushfield was subject to a forty-five day mandatory leave for a disciplinary reason while the investigation was carried out. The investigation by Bushfield's supervisors could be compared to a pit bull with its teeth sunk into a plush dog toy. There is, therefore, sufficient evidence presented by Bushfield, as the non-moving party, to support a finding that the investigation constituted an adverse action.

Second, Donahoe's comparison of the Postal Service investigation to cases that upheld investigations concerning the validity and authenticity of a medical certification form are distinguishable. Donahoe cited *Rhynes-Hawkins v. Potter*, No. 06-2763-STA-EGB, 2009 WL 5031312 *10 (W.D. Tenn. Dec. 15, 2009), as an example supporting the legitimacy of its investigation. But the employee's complaint in *Potter* concerned the employer's request for recertification of the employee's need for leave. The investigation in *Potter* was relatively benign, consisting of asking for recertification six months before the employee's physician's certification expired.

**MEMORANDUM DECISION AND ORDER - 20**

In contrast, Bushfield's medical certification from Dr. McPeak was not questioned. He provided a medical certification, and the Postal Service approved his FMLA request for intermittent leave on February 20, 2009. The Postal Service therefore had a valid medical opinion. Nor was Bushfield accused of FMLA abuse; rather, the investigation concerned suspected falsification of his pre-employment medical questionnaire precisely because of his request for FMLA leave. Yet, Boyer's inquisition asked personal medical questions such as, "when you are having an episode, do they vary in severity," and "what affects [sic] has this disorder had in your personal life," questions which could support a finding that they did not relate to suspected dishonesty on the pre-employment questionnaire.

Donahoe next cites a case that holds that the FMLA does not prohibit an employer from investigating allegations of dishonesty or from terminating employment for violations of company policy regarding dishonesty. *Hoskins v. Pridgeon & Clay, Inc.*, No. 1:05-cv-816, 2007 WL 1031636 *10—11 (W.D. Mich. Apr. 3, 2007). However, in *Hoskins*, the employee was suspected of lying about her reason for taking leave, because she falsely represented that her leave was FMLA qualifying leave when she may not have been ill at all. Such is not the case here. Donahoe does not dispute that Bushfield qualified for FMLA leave, nor does he contend that leave taken after February 20, 2009, was not FMLA qualifying leave. Moreover, Donahoe has not cited the Court to any Postal Service policy regarding termination of employment for general dishonesty unrelated to the essential functions of Bushfield's job duties. Nor has Donahoe explained how the alleged dishonesty about Bushfield's medical condition was material to his

**MEMORANDUM DECISION AND ORDER - 21**

continued employment or to hiring Bushfield in the first instance. At the hearing, Donahoe merely proffered that honesty is always a legitimate qualification or quality, but failed to link the dishonest action here with any Postal Service policy related to the qualifications for employment.

The failure to link dishonesty with any Postal Service policy is a fatal shortcoming in light of the proffered reasons for asking Bushfield about his medical history at the time Bushfield applied for the job. When Bushfield completed the questionnaire, he was provided with a list of the essential physical functions required on the job. It is conceivable, therefore, that Bushfield's explanation---he did not believe he had a serious medical condition and he answered the questions in light of those physical requirements---counters the Postal Service's argument that Bushfield was even dishonest. A question of fact whether Bushfield was dishonest exists, which question cannot be resolved on summary judgment.

The third reason Donahoe's argument does not pass muster under the Ninth Circuit's standards is the temporal proximity of the investigation, which began three days after Bushfield's FMLA leave was approved. Although an employer is not necessarily required to cease pursuing a disciplinary course of action against an employee that began before the employee took FMLA-related leave, the proximity in time between the protected action and the alleged retaliatory employment decision is an important factor. *Ray*, 217 F.3d at 1244; *see also Perez-Denison v. Kaiser Foundation Health Plan*, No. 3:10-cv-00903-HU, 2012 WL 1185995 *14 (D. Or. Apr. 9, 2012) (finding the timeline of events instructive). In this case, the suspension and resulting disciplinary investigation

**MEMORANDUM DECISION AND ORDER - 22**

followed upon the heels of Bushfield's FMLA leave approval, and was not a continuing investigation that began before Bushfield's FMLA leave request.

Although the Postal Service disciplined Bushfield for irregular attendance prior to his FMLA leave approval, the investigation into the suspected falsification of the pre-employment application is a separate disciplinary action based entirely upon the FMLA leave request and approval. Had Bushfield not requested and received approval of his leave request, the Postal Service would not have undertaken the investigation. The disciplinary action occurred precisely because Bushfield qualified for FMLA leave for a condition that pre-dated his employment, but was not formally diagnosed until after he had begun work. Accordingly, the timing of the disciplinary investigation is suspect.

It is therefore conceivable that the lengthy suspension, albeit with pay, and the unrelenting investigation into the nature, severity, and effects of Bushfield's PTSD by his supervisors amounted to an adverse employment action. The Postal Service possessed Dr. McPeak's FMLA certification, her letter clarifying the VA disability determination, and the VA disability determination itself. The Postal Service knew also that Bushfield explained on March 12, 2009, he was unaware his condition constituted PTSD, and even if it did, that he did not realize it was a debilitating psychiatric condition that should have been disclosed on his pre-employment medical questionnaire. Yet, despite having sufficient information about the reasons for Bushfield's FMLA request, the Postal Service requested Bushfield's entire VA medical file, required him to endure personal questions asked by his non-health professional supervisors, placed him on extended leave and prevented him from coming to work for more than a month. All of those factors

**MEMORANDUM DECISION AND ORDER - 23**

reasonably could support a finding that Bushfield suffered an adverse employment action that culminated in his resignation upon his return to work, and present disputed factual issues that the Court cannot resolve on summary judgment.

Finally, Donahoe casually tosses out an argument that Bushfield's claims based upon events that occurred prior to his return to work in June of 2009 are time barred under 29 U.S.C. § 2617(c)(1), because the acts predate the May 26, 2010, filing of the complaint in this matter. Bushfield argues that the entire investigation, and his resulting resignation, constituted a continuing practice of unlawful conduct.

The continuing violations doctrine permits a court to consider events that would otherwise be time-barred if the untimely incidents are part of an ongoing unlawful employment practice. *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1107 (9th Cir. 1998). Bushfield can avail himself of this theory by demonstrating that his claims are founded upon a pattern or practice of his employer's conduct that continued into the relevant period of limitations.

Bushfield continued to be out on disciplinary leave through June 6, 2009, and the investigation was part of a continuing course of conduct into the applicable two-year limitations period. Bushfield was not told until June 5, 2009, that he could return to work and that his disciplinary suspension with pay was over. Upon his return to work, Bushfield contends he was subjected to disparaging remarks by his supervisor, Dan Day, during his June 7, 2009 shift about the reasons for his leave and his PTSD symptoms, causing him to suffer a panic attack that landed him in the emergency room on the morning of June 8, 2009. The Court therefore finds that Donahoe has not carried his

**MEMORANDUM DECISION AND ORDER - 24**

burden regarding application of the statute of limitations to bar Bushfield's claims as a matter of law, as more fully explained in the following section.

**B.    *Hostile Work Environment***

Bushfield argues there are disputed issues of material fact whether the continued investigation, as well as its intrusive nature, constituted a hostile work environment resulting in Bushfield's constructive discharge. In contrast, Donahoe argues that Bushfield's allegations are insufficient as a matter of law to sustain a finding that his working conditions were so intolerable, pervasive or severe that an objectively reasonable person would have felt forced to resign.

The Ninth Circuit has not yet decided whether an employee may obtain relief under 29 U.S.C. § 2615(a)(1) for constructive discharge. *Nealey v. BNSF Railway Co.*, No. CV-06-5057-FVS, 2007 WL 4287272 (E.D. Wash. Dec. 4, 2007).[8] However, the Fifth Circuit considered in *Hunt v. Rapides Healthcare Sys., LLC*, 277 f.3d 757 (5th Cir. 2001), a plaintiff's claim of constructive discharge under the FMLA. *Hunt* analyzed whether the plaintiff felt compelled to resign after having to take a less desirable shift upon her return from FMLA leave. In *Nealey*, the court reasoned that the Ninth Circuit would apply principles of law that have developed under federal antidiscrimination statutes and would follow *Hunt*'s analysis if presented with a constructive discharge claim under the FMLA. *Nealey*, 2007 WL 4287272 at *4.

---

[8] Donahoe mistakenly cites *Cates v. Pub. Emp. Ret. Sys. of Nev.*, 357 Fed.Appx. *8 (9th Cir. Oct. 27, 2009) as rejecting a constructive discharge theory forming the basis of a FMLA claim. *Cates* does not so hold. Rather, Cates brought a claim for tortious constructive discharge under state law, not under the FMLA. Thus, the court in that case did not reject the employee's constructive discharge theory because it was improper under the FMLA, but rather held that the district court properly granted summary judgment on Cate's claim for tortious constructive discharge under Nevada state law. *Cates*, 357 Fed. Appx. at *8.

**MEMORANDUM DECISION AND ORDER - 25**

In the Ninth Circuit, to establish constructive discharge, Bushfield must prove that his workplace was so intolerable from an objective point of view that a reasonable person in his position would have felt compelled to resign. *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Working conditions must deteriorate to the point that they become "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland*, 494 F.3d at 1184 (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). A variety of factors may be considered, including demotion; reduction in salary or job responsibilities; reassignment to menial or degrading work; badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or offers of early retirement that would make the employee worse off whether the offer was accepted or not. *Hunt*, 277 F.3d at 771—72. A plaintiff need not establish that his employer created the intolerable conditions with the intent to cause the employee to resign. *Poland*, 494 F.3d at 1184 n.7.

Construing the facts in Bushfield's favor, as the Court must, the Court cannot conclude as a matter of law that Bushfield's claim lacks evidence to support his theory of constructive discharge. Instead, there exist disputed issues of material fact. While on disciplinary leave for forty-five days, Bushfield was subjected to what could be viewed by a reasonable person as an intense, personally invasive investigation into the facts and circumstances of his PTSD disorder under the guise of investigating his truthfulness on a pre-employment questionnaire. Upon returning to work, Bushfield claims he was subjected to continued harassment by his supervisor concerning the reasons for his leave.

**MEMORANDUM DECISION AND ORDER - 26**

In addition, Bushfield claims that rumors among his co-workers circulated about him based upon personal medical information they received from someone other than Bushfield himself.

There exist genuine issues of material fact regarding Bushfield's claim for interference that are interwoven with his claim for constructive discharge. In viewing the facts presented in a light most favorable to Bushfield, the claim for constructive discharge survives summary judgment.

**5.      Dismissal Regardless of FMLA Leave**

Donahoe argues that, even if Bushfield could present evidence sufficient to support his FMLA interference claim, the Postal Service would prevail because it has established Bushfield would have been dismissed regardless of his FMLA leave. In other words, the Postal Service claims that, had it known about Bushfield's PTSD prior to June 5, 2009, it would have terminated Bushfield's employment for falsifying his application, both for dishonesty about his medical condition and because he failed to disclose he had been fired from Aladdin. *See Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 877—78 (10th Cir. 2004) ("If dismissal would have occurred regardless of the request for an FMLA leave, however, an employee may be dismissed even if dismissal prevents her exercise of her right to an FMLA leave"); *see also Sanders*, 657 F.3d at 780. The employer bears the burden of proving that an employee would have been dismissed regardless of the employee's request for, or taking of, FMLA leave. *Sanders*, 657 F.3d at 780.

**MEMORANDUM DECISION AND ORDER - 27**

Bushfield argues that Donahoe's arguments are without merit, because the cases applying the rule articulated by *Bones* and *Sanders* involve employees actually terminated from employment, whereas Bushfield was reinstated following his forty-five day suspension. Further, Bushfield contends that the Postal Service already had evidence of Bushfield's preexisting condition during its investigation, but now claims had they known of the information in Bushfield's medical file, they would have terminated his employment instead. And finally, regarding Bushfield's termination from employment by Aladdin Bail Bonds, Bushfield argues that Donahoe's argument is flawed because Bushfield was let go when he informed Aladdin that the Postal Service hired him, and not fired for misconduct.

The rule Donahoe seeks to apply arises in cases where the employer has refused to reinstate an employee after returning from FMLA leave. *Sanders*, 657 F.3d at 782. It is therefore difficult for the Court to discern how the rule applies when the employee was not actually discharged from employment after his FMLA was approved and no intervening misconduct occurred. Donahoe's argument requires the Court to stretch its powers of logic, and assume facts that the Postal Service did not have at the time it made its decision to withdraw the Notice of Removal and return Bushfield to the workplace. In other words, the Postal Service argues that, had Bushfield supplied his medical records during the course of the Postal Service's investigation, the Postal Service would have terminated Bushfield's employment for falsely answering questions in the medical questionnaire. But the Postal Service did not have that information, and instead chose not to terminate Bushfield's employment based upon the evidence it did have. Yet, the

**MEMORANDUM DECISION AND ORDER - 28**

evidence the Postal Service did have disclosed Bushfield suffered from a preexisting medical condition.

Moreover, even accepting the Postal Service's argument, the Court finds it difficult to accept Donahoe's position that it would have terminated Bushfield's employment even if it had the medical records, because of the purpose for the questionnaire. The questionnaire was designed to aid the Postal Service in determining an applicant's medical suitability and ability to perform the specific duties of the position. The application materials included a list of the physical demands of the position for which Bushfield applied. An employee's inability to complete the essential functions of his job is a legitimate reason to deny reinstatement or employment in the first instance. *Sanders*, 657 F.3d at 782. Thus, there must be a nexus between the medical condition and the inability to perform an essential job function. *See* 29 C.F.R. § 825.306 (listing and limiting the details that an employer may require in a medical certification, which must include information sufficient to establish that the employee cannot perform the essential functions of the employee's job).

For example, if an employee had a back condition that he did not disclose but which would have prevented him from lifting the required forty pounds, the Court can understand how that material omission might cause an employer to terminate an employee's employment for falsifying his or her medical questionnaire. That employee may not have been hired in the first instance had the employer known of the condition, because of the material connection between the medical condition and the inability to perform the required job duties.

**MEMORANDUM DECISION AND ORDER - 29**

But the facts of this case are not those facts. Although Ball explained it was policy to discharge employees who falsified "material information" in connection with their pre-employment questionnaire, and that he would have advised the Boise office to terminate Bushfield's employment for falsifying his application and medical history questionnaire, Ball has not provided any explanation or evidence how Bushfield's PTSD, and the failure to disclose it, was material. FMLA considers materiality in connection with the inability to perform essential job functions. But Boyer indicated that the fact Bushfield had PTSD would not have automatically disqualified Bushfield from employment.

The lack of an evidentiary nexus between Bushfield's PTSD and the list of Bushfield's essential job functions, as well as Boyer's statement that Bushfield would not have been automatically disqualified from employment because of his PTSD, undermines Donahoe's argument. If Bushfield had disclosed his PTSD and answered "yes" to the three questions instead of "no," Boyer's statement indicates the Postal Service well may have hired Bushfield in spite of Bushfield's medical condition, contradicting Ball's statement that the falsification was material to Bushfield's continued employment. If Boyer's statement is believed, then Ball's statement indicates Bushfield would have been terminated from employment simply for not disclosing a medical condition immaterial to his continued ability to perform the essential functions of his job. The discrepancy presents a factual issue that cannot be resolved on summary judgment.

The second factual issue concerns whether Bushfield was dishonest at all. He consistently explained to his supervisors that he did not know he suffered from PTSD despite the notations in his medical charts, and that he was unaware at the time he

completed the pre-employment questionnaire that PTSD constituted a serious medical condition. Further, the VA determination indicated the diagnosis of PTSD prior to October of 2008 was provisional.

Finally, Donahoe asserts the Postal Service would have terminated Bushfield's employment for dishonesty about his termination from Aladdin's employ. But there exists a disputed issue of fact whether Bushfield's prior employment was terminated at all. Bushfield indicated he had intended to continue working at Aladdin until he was scheduled to begin work at the Post Office on December 26, 2007, but upon submitting his letter of resignation, he was told by Aladdin to go home and not to return. Bushfield was not let go for misconduct, but because he had another job and gave his two week notice.

There is one last problem with Donahoe's argument that the evidence it uncovered during this lawsuit provides a basis upon which it could have denied Bushfield's continued employment. Donahoe essentially contends that the after acquired evidence found in Bushfield's medical records constitutes application falsification, and therefore the Postal Service is not liable. But the "after acquired evidence" defense[9] is a means to negate damages, not liability, as Donahoe attempts to do here. *See E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 901 (9th Cir. 1994); *See also O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir. 1996) (explaining that the only issue raised by

---

[9] Donahoe did not raise an after acquired evidence defense in his answer, but referenced it during the hearing on the motion.

**MEMORANDUM DECISION AND ORDER - 31**

the employer's after-acquired evidence is what the employee's remedy will be).

Donahoe's argument is therefore misapplied.

## 6.     Jury or Court Trial

Although Bushfield demanded a trial by jury in the Complaint, Donahoe responded in his

answer that a lawsuit brought by a government employee under the Postmaster General

of the United States is a lawsuit against the United States, and therefore Bushfield is not

entitled to a jury trial under the Seventh Amendment. Donahoe asked that Bushfield's

jury trial demand be stricken under Fed. R. Civ. P. 39(a)(2). The Court will consider the

issue of whether a court or jury trial should be conducted at the time trial is scheduled.

### CONCLUSION

Disputed fact issues material to determining Bushfield's claim that the Postal

Service interfered with his ability to exercise his right to FMLA leave, or otherwise

caused him to suffer an adverse employment action as a consequence of requesting and

taking FMLA leave, preclude summary judgment as to Bushfield's interference claim and

retaliation claim. Accordingly, this Court denies Donahoe's motion for summary

judgment.

The Court will conduct a scheduling conference with the parties to determine

further pre-trial deadlines and to set this matter for trial. Plaintiff is instructed to consult

with Defendant, and to call Courtroom Deputy Amy Hickox at (208) 334-9387 to set this

matter for a scheduling conference.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

Defendant's Motion for Summary Judgment (Dkt.23) is **DENIED**.

The Court will conduct a telephonic scheduling conference within thirty days to discuss setting this matter for trial, and to set pre-trial deadlines.

Dated: **December 06, 2012**

Honorable Candy W. Dale
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 33**